**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------

| | |
|---|---|
| FAIR HOUSING JUSTICE CENTER, INC., | **15-CV-6336** |
| Plaintiff, | **AMENDED COMPLAINT** |
| v. | <u>**JURY TRIAL DEMANDED**</u> |
| ALLURE REHABILITATION SERVICES LLC;<br>ALLURE CARE MANAGEMENT, LLC;<br>THE ALLURE GROUP;<br>WILLIAMSBURG SERVICES, LLC;<br>HAMILTON PARK MULTICARE LLC;<br>CASSENA CARE LLC;<br>SHORE VIEW ACQUISITION I, LLC;<br>AMSTERDAM NURSING HOME<br>CORPORATION;<br>SEA CREST HEALTH CARE CENTER, LLC;<br>SEA CREST ACQUISITION I, LLC;<br>JOPAL SAYVILLE, LLC;<br>CENTERS FOR SPECIALTY CARE GROUP<br>LLC;<br>BORO PARK OPERATING CO, LLC;<br>PROSPECT PARK OPERATING, LLC;<br>SENTOSACARE, LLC;<br>WHITE PLAINS CENTER FOR NURSING<br>CARE LLC;<br>EASTCHESTER REHABILITATION AND<br>HEALTH CARE CENTER, LLC; and<br>GOLDEN GATE REHABILITATION AND<br>HEALTH CARE CENTER, LLC, | |
| Defendants. | |

-------------------------------------------------------------

Plaintiff, FAIR HOUSING JUSTICE CENTER, INC. ("Plaintiff"), by and through its

undersigned counsel, EISENBERG & BAUM, LLP, for its Complaint against ALLURE

REHABILITATION SERVICES LLC; ALLURE CARE MANAGEMENT, LLC; THE ALLURE

GROUP; WILLIAMSBURG SERVICES, LLC; HAMILTON PARK MULTICARE LLC;

CASSENA CARE LLC; SHORE VIEW ACQUISITION I, LLC; AMSTERDAM NURSING HOME CORPORATION; SEA CREST HEALTH CARE CENTER, LLC; SEA CREST ACQUISITION I, LLC; JOPAL SAYVILLE, LLC; CENTERS FOR SPECIALTY CARE GROUP LLC; BORO PARK OPERATING CO, LLC; PROSPECT PARK OPERATING, LLC; SENTOSACARE, LLC; WHITE PLAINS CENTER FOR NURSING CARE LLC; EASTCHESTER REHABILITATION AND HEALTH CARE CENTER, LLC; and GOLDEN GATE REHABILITATION AND HEALTH CARE CENTER, LLC, Defendants, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff is the Fair Housing Justice Center ("FHJC"), a non-profit organization that ensures that all people, including deaf individuals, have equal access to housing in New York City and surrounding counties.  Defendants, the owners of numerous nursing homes and assisted living residences, both in New York City and the outer suburbs, discriminate against deaf residents, both prospective and current, by refusing to provide effective auxiliary aids and services for their disabilities, despite repeated requests for effective communication to ensure equal access.

2.      American Sign Language ("ASL") is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. ASL is best thought of as a foreign language used by American deaf people, with its own grammar and syntax. Deaf individuals are often educated in Deaf schools and grow up in culturally Deaf environments. As a result of both physical and environmental factors, deaf individuals frequently have great difficulty achieving command of spoken or written English. From a pedagogical standpoint, for example, it is difficult to understand how English works if a person has never heard it. However, deaf individuals are often able to communicate with great

2

complexity in ASL.

3.      Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for communication through a qualified sign language interpreter. Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even the most adept lip-readers, in an ideal one-to-one situation, have been found to understand only 26% of what is said.

4.      For these reasons, ASL interpreters are necessary for the great majority of deaf individuals receiving medical, nursing home, and assisted living and rehabilitation care when that care involves complicated information, lengthy communications, or when the individual has other conditions that make seeing or communicating through other means more difficult.

5.      FHJC utilized fair housing Testers to determine whether Defendants would supply an ASL interpreter for a deaf resident if requested or necessary. When the Testers from the FHJC inquired about nursing home facilities for prospective elderly deaf relatives, they were told that their relatives would not be provided interpreters; instead, they were told that the relatives could provide their own interpreters, or could communicate to nursing home staff through writing. Writing is not an effective means of communicating since residents would have difficulty understanding complex procedures involved in services such as assessment, planning, intake, screening, medical care, recreation, therapy, meetings, psychological services, discharge instructions, DNR documentation, prescribed medications, and power-of-attorney, among others.

6.      In the context of residential medical care provided to elderly individuals, the outright refusal to provide an ASL interpreter for any situation will result in ineffective communication for elderly deaf residents. Defendants thus discriminate against elderly deaf

residents and prospective residents by failing and/or refusing to provide qualified American Sign Language interpreters or other auxiliary aids and services to ensure effective communication.

7.     Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices and to implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' residential and health care services.  Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et. seq.; The Fair Housing Act ("FHA"), 42 U.S.C. § 3602; and/or other state and common law causes of action.

## THE PARTIES

8.     Plaintiff FHJC is a non-profit organization with its principal office located at 5 Hanover Square, 17th Floor, New York, New York 10004, in the Southern District of New York.

9.     FHJC is a non-profit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open, accessible, and inclusive communities.

10.     To this end, FHJC provides various services, including (a) information to the public and other nonprofit organizations in the New York City regional area about fair housing laws; (b) intake counseling to individuals and organizations regarding allegations of housing discrimination; (c) testing and other investigations of allegations of housing discrimination; (d) legal referrals to cooperating attorneys; (e) assistance with the preparation and filing of administrative housing discriminations complaints; and (f) post-referral litigation support services. FHJC provides these

services free of charge and without regard to income.

11.   FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further the FHJC's mission, including the publication and dissemination of reports and educational materials.

12.   FHJC employs "Testers," who are individuals who pose as prospective renters, home buyers, residents, and the like for the purpose of obtaining information about the conduct of local governments, landlords, real estate agents, companies, and others to determine if housing discrimination is taking place.

13.   FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other FHJC activities.

14.   Defendants' discriminatory rental practices frustrated FHJC's mission to ensure that all people have equal access to housing opportunities in New York by, among other things, making nursing home and assisted living facilities inaccessible by reason of disability.

15.   Defendant ALLURE REHABILITATION SERVICES LLC is the owner, lessor, and/or operator of Bedford Center for Nursing and Rehabilitation, located at 40 Heyward Street, Brooklyn, New York 11249; and Hamilton Park Nursing and Rehabilitation Center, located at 691 92nd Avenue, Brooklyn, New York 11228. Upon information and belief, Defendant is a New York corporation doing business within this judicial District with a principal place of business at 691 92nd Avenue, Brooklyn, New York 11228, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

16.   Defendant ALLURE CARE MANAGEMENT, LLC is the owner, lessor, and/or operator of Bedford Center for Nursing and Rehabilitation, located at 40 Heyward Street, Brooklyn,

New York 11249; and Hamilton Park Nursing and Rehabilitation Center, located at 691 92nd Avenue, Brooklyn, New York 11228. Upon information and belief, Defendant is a New York corporation doing business within this judicial District with a principal place of business at 691 92nd Avenue, Brooklyn, New York 11228, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

17. Defendant THE ALLURE GROUP is the owner, lessor, and/or operator of Bedford Center for Nursing and Rehabilitation, located at 40 Heyward Street, Brooklyn, New York 11249; and Hamilton Park Nursing and Rehabilitation Center, located at 691 92nd Avenue, Brooklyn, New York 11228. Upon information and belief, Defendant is a New York corporation doing business within this judicial District with a principal place of business at 691 92nd Avenue, Brooklyn, New York 11228, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

18. Defendant WILLIAMSBURG SERVICES, LLC is the owner, lessor, and/or operator of Bedford Center for Nursing and Rehabilitation, located at 40 Heyward Street, Brooklyn, New York 11249. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 40 Heyward Street, Brooklyn, New York 11249, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

19. Defendant HAMILTON PARK MULTICARE LLC is the owner, lessor, and/or operator of Hamilton Park Nursing and Rehabilitation Center, located at 691 92nd Avenue, Brooklyn, New York 11228. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 691 92nd Street, Brooklyn, New York 11228, and is a recipient of federal financial assistance, including Medicare

and/or Medicaid reimbursements.

20.     Defendant CASSENA CARE LLC is the owner, lessor, and/or operator of Shore View Nursing and Rehabilitation Center, located at 2865 Brighton 3rd Street, Brooklyn, New York 11235; Amsterdam Nursing Home, located at 1060 Amsterdam Avenue, New York, New York 10025; Sea Crest Nursing and Rehabilitation Center, located at 3035 West 24th Street, Brooklyn, New York 11224; and Sayville Nursing Home and Rehabilitation Center, located at 300 Broadway Avenue, Sayville, New York 11782. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 225 Crossways Park Drive, Woodbury, New York 11797, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

21.     Defendant SHORE VIEW ACQUISITION I, LLC is the owner, lessor, and/or operator of Shore View Nursing and Rehabilitation Center, located at 2865 Brighton 3rd Street, Brooklyn, New York 11235. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 2865 Brighton & 3rd Street, Brooklyn, New York 11235, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

22.     Defendant AMSTERDAM NURSING HOME CORPORATION is the owner, lessor, and/or operator of Amsterdam Nursing Home, located at 1060 Amsterdam Avenue, New York, New York 10025. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 1060 Amsterdam Avenue, New York, New York 10025, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

23.     Defendant SEA CREST HEALTH CARE CENTER, LLC is the owner, lessor,

and/or operator of Sea Crest Nursing and Rehabilitation Center, located at 3035 West 24th Street, Brooklyn, New York 11224. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 3035 West 24th Street, Brooklyn, New York 11224, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

24.     Defendant SEA CREST ACQUISITION I, LLC is the owner, lessor, and/or operator of Sea Crest Health Care Center, located at 3035 West 24th Street, Brooklyn, New York 11224. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 3035 West 24th Street, Brooklyn, New York 11224, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

25.     Defendant JOPAL SAYVILLE, LLC is the owner, lessor, and/or operator of Sayville Nursing Home and Rehabilitation Center, located at 300 Broadway Avenue, Sayville, New York 11782. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 300 Broadway Avenue, Sayville, New York 11782, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

26.     Defendant CENTERS FOR SPECIALTY CARE GROUP LLC is the owner, lessor, and/or operator of Boro Park Center for Rehabilitation and Health Care, located at 4915 10th Avenue, Brooklyn, New York 11219; and Brooklyn Center for Rehabilitation and Residential Health Care, located at 1455 Coney Island Avenue, Brooklyn, New York 11230. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 4770 White Plains Road, Bronx, New York 10470, and is a recipient

of federal financial assistance, including Medicare and/or Medicaid reimbursements.

27.     Defendant BORO PARK OPERATING CO, LLC is the owner, lessor, and/or operator of Boro Park Center for Rehabilitation and Health Care, located at 4915 10th Avenue, Brooklyn, New York 11219. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 4915 Tenth Avenue, Brooklyn, New York 11219, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

28.     Defendant PROSPECT PARK OPERATING, LLC is the owner, lessor, and/or operator of Brooklyn Center for Rehabilitation and Residential Health Care, located at 1455 Coney Island Avenue, Brooklyn, New York 11230. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 1455 Coney Island Avenue, Brooklyn, New York 11230, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

29.     Defendant SENTOSACARE, LLC is the owner, lessor, and/or operator of Spring Creek Rehabilitation and Nursing Care Center, located at 660 Louisiana Avenue, Brooklyn, New York 11239; White Plains Center for Nursing Care, located at 220 West Post Road, White Plains, New York 10606; Throgs Neck Extended Care Facility, located at 707 Throgs Neck Expressway, Bronx, New York 10465; Eastchester Rehabilitation and Health Care Center, located at 2700 Eastchester Road, Bronx, New York 10469; and Golden Gate Rehabilitation and Health Care Center, located at 191 Bradley Avenue, Staten Island, New York 10314. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 20 Franklin Place, Woodmere, New York 11598, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

30. Defendant WHITE PLAINS CENTER FOR NURSING CARE LLC is the owner, lessor, and/or operator of White Plains Center for Nursing Care, located at 220 West Post Road, White Plains, New York 10606. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 220 West Post Road, White Plains, New York 10606, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

31. Defendant EASTCHESTER REHABILITATION AND HEALTH CARE CENTER, LLC is the owner, lessor, and/or operator of Eastchester Rehabilitation and Health Care Center, located at 2700 Eastchester Road, Bronx, New York 10469. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 2700 Eastchester Road, Bronx, New York 10469, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

32. Defendant GOLDEN GATE REHABILITATION AND HEALTH CARE CENTER, LLC is the owner, lessor, and/or operator of Golden Gate Rehabilitation and Health Care Center, located at 191 Bradley Avenue, Staten Island, New York 10314. Upon information and belief, Defendant is a New York corporation doing business in this judicial District with a principal place of business at 191 Bradley Avenue, Staten Island, New York 10314, and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements.

## JURISDICTION & VENUE

33. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims arising under state and local law.

34. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that

give rise to the claims occurred in this District, and/or the Defendants have sufficient contacts with

this District to subject them to personal jurisdiction at the time this action is commenced.

## **STATEMENT OF FACTS**

FHJC Testing

35.     FHJC's testing investigation against the Defendants involved Testers making

telephone or videophone calls to Defendants, and/or visiting Defendants' facilities in person. The

Testers, operating under aliases, made inquiries purportedly on behalf of fictional deaf relative(s).

The Testers gathered preliminary information about Defendants' services and inquired specifically

about the availability of auxiliary aids and services, including onsite ASL interpreters, for their

deaf relative(s).

36.     Audio and/or video recordings were made of all contacts between the Testers and

agents of the Defendants.

Factual Allegations Against Defendants ALLURE REHABILITATION SERVICES LLC, ALLURE CARE MANAGEMENT, LLC; and THE ALLURE GROUP (and/or WILLIAMSBURG SERVICES, LLC and/or HAMILTON PARK MULTICARE LLC)

*Test #1*

37.     On October 22, 2014, Tester V.D., under an alias, visited Hamilton Park

Rehabilitation Center on behalf of her "deaf aunt."

38.     Tester V.D. was in contact with Hamilton Park's Director of Admissions Patricia

Hogan during her visit of the facility. Tester V.D. mentioned to Ms. Hogan that her "aunt" is deaf

and "needed someone to sign for her." Ms. Hogan told Tester V.D. that Ms. Hogan would ask her

boss about a sign language interpreter and get back to Tester V.D.

39.     On October 28, 2014, Tester V.D. called Ms. Hogan and was told by Ms. Hogan

that the nursing home would not provide a sign language interpreter for deaf residents.

*Test #2*

40.     On January 28, 2015, Tester L.J., who is deaf, under an alias, called Hamilton Park Nursing Home via videophone to inquire whether they would provide an ASL interpreter for an elderly deaf resident.

41.     Tester L.J. asked to speak with someone in Admissions but was put on hold indefinitely and eventually ended the call. Tester L.J. called back twenty minutes later and asked to speak with someone in Admissions. Tester L.J. was asked, "who are you?!" and "who are you trying to contact?!" Tester L.J. then asked if the facility would provide an interpreter for his "deaf mother." A representative from the facility told Tester L.J. that she would write his name down and transfer him elsewhere. Tester L.J. repeatedly said that he needed an interpreter for his mother. Without responding to his requests, the representative hung up on Tester L.J.

*Test #3*

42.     On October 14, 2014, Tester L.D., under an alias, visited Bedford Center for Nursing and Rehabilitation on behalf of her "deaf grandmother."

43.     Tester L.D. met with a woman named Nicolette, and the Bedford Center Director of Admissions, Esther Katzburg. Ms. Katzburg told Tester L.D. that the facility does not have an interpreter for deaf residents. Instead, Ms. Katzburg told Tester L.D. that the facility has hard of hearing residents with whom they communicate through writing boards and symbol boards, but there were no staff members who communicated through ASL, and no interpreters were available.

<u>Factual Allegations Against Defendants CASSENA CARE LLC (and/or SHORE VIEW ACQUISITION I, LLC and/or AMSTERDAM NURSING HOME CORPORATION and/or SEA CREST HEALTH CARE CENTER, LLC and/or SEA CREST ACQUISITION I, LLC and/or JOPAL SAYVILLE, LLC)</u>

*Test # 1*

44.     On November 7, 2014, Tester R.G., under an alias, visited Shore View Nursing and Rehabilitation Center on behalf of his "deaf aunt."

12

45.     Tester R.G. met with Shore View Admissions Coordinator Belen Ausley and a woman named Maya. Tester R.G. informed Maya that his "aunt" was deaf and would need an ASL interpreter. Maya informed Tester R.G. that she would need to check with Belen Ausley to see if an interpreter would be provided.

46.     After waiting for over two weeks, Tester R.G. attempted to call Belen Ausley at Shore View on November 19th to request an ASL interpreter for his "aunt." He was told by a representative of Shore View that Ms. Ausley would call him back shortly once she checked with her Administrator.

47.     On January 16, 2015, Tester M.P., using the same alias that Tester R.G. had used, called Shore View Nursing Home at 11:30 a.m. to inquire whether an interpreter could be provided for a deaf family member.

48.     Tester M.P. spoke with a woman named Maya, who told Tester M.P. that the facility did not have an ASL interpreter but that "deaf residents could communicate through pictures or writing."

*Test #2*

49.     On January 23, 2015, Tester L.J., who is deaf, under an alias, called Shore View Nursing through a videophone to inquire whether Shore View offered an ASL interpreter for elderly deaf residents.

50.     Tester L.J. asked to speak with Maya, but was told by a representative of Shore View that she was unavailable. Tester L.J. then asked for the Director of Admissions and was put through to a woman named Liz. Tester L.J. asked Liz if the facilities would provide an ASL interpreter, but Liz was unsure. Tester L.J. asked Liz again if the facility would provide an ASL interpreter. Liz put Tester L.J. on hold, and eventually told him that the facility would not provide an interpreter.

13

*Test #3*

51.     On November 19, 2014, Tester S.B., under an alias, called Amsterdam Nursing Home to inquire about an ASL interpreter for her "deaf aunt."

52.     Tester S.B. spoke with an admissions staff member for Amsterdam Nursing Home named Amelia over the phone. Tester S.B. asked Amelia whether the nursing home would provide an ASL interpreter for her "aunt." Tester S.B. was told by Amelia that Amsterdam Nursing Home does not provide ASL interpreters.

*Test #4*

53.     On November 12, 2014, Tester M.P., under an alias, visited the Sea Crest nursing home on behalf of his "deaf mother."

54.     Tester M.P. met with Sea Crest nursing home staff member Donna Sheps. Tester M.P. asked Ms. Sheps whether there was a staff member who was ASL fluent. Ms. Sheps told Tester M.P. that she would check with an administrator to find out the information. Ms. Sheps later told Tester M.P. that there are no ASL interpreters at the facility but someone could communicate with a deaf resident by writing at any meetings, church services, and bingo games. Ms. Sheps also told Tester M.P. that the nursing home would be able to communicate with a deaf resident through pointing and gesturing.

*Test #5*

55.     On December 18, 2014, Tester M.P., under an alias, visited Sayville Nursing and Rehabilitation Center on behalf of his "deaf aunt."

56.     Tester M.P. met with Danielle Greenan, a representative for Sayville Nursing and Rehabilitation Center, and inquired whether the facility would provide an ASL interpreter. Ms. Greenan told Tester M.P. that she would call him back after she found out whether the facility would provide an interpreter.

14

57.     On January 15, 2015, Ms. Greenan called Tester M.P. back. Ms. Greenan told Tester M.P. that the facility did not have an ASL interpreter; rather, they used a program called "Language Live," which is a computer program that translates all languages onto a computer screen. Tester M.P. was told that ASL is part of the "Language Live" program. Tester M.P. asked Ms. Greenan how the program worked for ASL but Ms. Greenan was uncertain. Ms. Greenan asked a colleague to clarify how the program worked and told Tester M.P. that a nursing home staff member would hold the computer screen and the deaf resident could see words on the screen translated into ASL. Tester M.P. was told that since the facility used "Language Live," it would not provide an ASL interpreter.

<u>Factual Allegations Against Defendants CENTERS FOR SPECIALTY CARE GROUP LLC (and/or BORO PARK OPERATING CO, LLC and/or PROSPECT PARK OPERATING, LLC)</u>

*Test # 1*

58.     On October 28, 2014 Tester V.D., under an alias, visited Boro Park Center for Rehabilitation and Health Care on behalf of her "deaf aunt."

59.     Tester V.D. met with Boro Park Center's Director of Admissions Kathy Song. Tester V.D. asked Ms. Song whether the facility offered an ASL interpreter for deaf, elderly residents. In response, Ms. Song stated that the facility did not have that service. Ms. Song further stated that Tester V.D.'s "aunt" would need to use a white board to communicate. Tester V.D. asked Ms. Song whether the facility would be willing to hire an ASL interpreter and was told "no" by Ms. Song.

*Test # 2*

60.     On January 28, 2015, Tester L.J., who is deaf, under an alias, called Boro Park Center for Rehabilitation and Health Care through a videophone to inquire whether they would offer an ASL interpreter for deaf elderly residents.

15

61.     Tester L.J. spoke with a representative of Boro Park Center, asked to speak with the Director of Admissions, and was transferred to Kathy Song, who stated that the facility does not offer sign language interpreters.

*Test #3*

62.     On January 20, 2015, Tester S.B., under an alias, visited Brooklyn Center for Rehabilitation and Residential Healthcare on behalf of her "deaf aunt."

63.     Tester S.B. met with Shireen Miah, Brooklyn Center's Director of Admissions, and Travis Walcott, Brooklyn Center's Assistant Director of Admissions. Tester S.B. was given a tour of the facilities, and in response to her inquiries about an ASL interpreter, was told by Ms. Miah that an ASL interpreter would not be provided for just one resident. Further, Ms. Miah told Tester S.B. that because the doctors are only available from 9 a.m. to 5 p.m. it did not make sense for the facility to have an ASL interpreter available for 24 hours.

Factual Allegations Against Defendants SENTOSACARE LLC (and/or WHITE PLAINS CENTER FOR NURSING CARE  and/or EASTCHESTER REHABILITATION AND HEALTH CARE CENTER, LLC and/or GOLDEN GATE REHABILITATION AND HEALTH CARE CENTER, LLC)

*Test # 1*

64.     On November 6, 2014, Tester R.G., using an alias, visited Spring Creek Rehabilitation and Nursing Care Center on behalf of his "deaf mother."

65.     Tester R.G. met with the Spring Creek Director of Admissions, Ari Ungar. Tester R.G. was given a tour of the facilities including the dining hall, activity room, and beauty parlor. In response to his inquiry, Mr. Ungar told Tester R.G. that there is no one on staff qualified in ASL. Mr. Ungar told Tester R.G. that there are deaf people at the facility, but they communicate through use of a communication board and writing.

*Test # 2*

66.     On March 4, 2015, Tester L.D., under an alias, called Spring Creek Rehabilitation Center.

67.     Tester L.D. asked to meet with the Director of Admissions or the Director of Therapy and Recreation. Tester L.D.  informed the person who answered the telephone for Spring Creek that her "deaf brother" had called the facility on behalf of their "deaf mother," and that she wanted to confirm from her "brother's" conversation with a representative named Erika that an interpreter could be provided. Tester L.D. spoke with Ari in the Admissions office. Ari told Tester L.D. that that the facility did not have an ASL interpreter and would not provide an ASL interpreter for Tester L.D.'s "mother." Ari stated that he did not know of other facilities that provided an ASL interpreter for deaf elderly residents. Ari stated that Tester L.D. should "ask ASL for an interpreter," whereupon Tester L.D. informed him that ASL is not an organization but rather the abbreviated term for American Sign Language. Tester L.D. expressed her disappointment with the facility and ended the phone call.

*Test #3*

68.     On November 18, 2014, Tester M.P., under an alias, visited Throgs Neck Extended Care Facility on behalf of his "deaf aunt."

69.     Tester M.P. met with a woman named Lisa who is believed to be a representative of Throgs Neck Extended Care Facility. Tester M.P. asked Lisa if there were accommodations for deaf elderly residents at the facility and whether an ASL interpreter would be provided. In response, Lisa told Tester M.P. "No," and "I don't think so" when asked about the availability of an ASL interpreter. Tester M.P. asked Lisa repeatedly whether there was someone she could check with regarding the availability of an interpreter. Lisa told Tester M.P. "Definitely, definitely no," the facility would not provide anyone who knew ASL.

*Test #4*

70.     On January 29, 2015, Tester M.P., under an alias, visited White Plains Center for Nursing Care on behalf of his "deaf grandmother."

71.     Tester M.P. met with the White Plains' Director of Admissions Yesenia Jessie Hidalgo. Tester M.P. asked Ms. Hidalgo whether the facility had an ASL interpreter.  Ms. Hidalgo told Tester M.P. that the facility offered braille. Tester M.P. informed Ms. Hidalgo that braille is for blind persons and not for those who are deaf. Ms. Hidalgo said that she did not believe they offered an ASL interpreter. Tester M.P. asked Ms. Hidalgo to check whether or not there were interpreter services. Ms. Hidalgo checked and told Tester M.P. that "no" an interpreter would not be provided.

*Test #5*

72.     On October 29, 2014, Tester S.B., under an alias, visited Eastchester Rehabilitation and Health Care Center on behalf of her "deaf aunt."

73.     Tester S.B. met with Jillian Brenner, the Eastchester Director of Admissions. Tester S.B. asked Ms. Brenner whether the facility has a staff member who is an ASL interpreter for elderly deaf residents. Ms. Brenner told Tester S.B. that she would look into the matter and get back to her.

74.     On October 29, 2014 at 3:15 p.m. Tester S.B. called Ms. Brenner to inquire whether an ASL interpreter would be provided. Ms. Brenner told Tester S.B. that she spoke with the Director of Nursing and there is no one on the nursing staff who is ASL fluent. Ms. Brenner told Tester S.B. that she would inquire whether there was an ASL fluent staff member in either the rehabilitation or recreation divisions of the facility.

75.     October 29, 2014, at 5:05 p.m. Tester S.B. received a voicemail from a woman

named Jillian, who said she was calling from Eastchester Rehabilitation.  Jillian stated that she spoke with the Director of Nursing and the facility would not provide an ASL interpreter, but that deaf residents could instead communicate through a communication board.

*Test #6*

76.     On March 12, 2015, Tester R.G., under an alias, visited Golden Gate Rehabilitation and Health Care Center on behalf of his "deaf aunt."

77.     Tester R.G. met with Golden Gate staff members Debra, a Speech Therapist, and Denise Fredrick, a registered nurse. Tester R.G. informed Debra and Denise that his "aunt" would need an ASL interpreter. Debra and Denise inquired whether Tester R.G.'s "aunt" was completely deaf or could lip read. Debra told Tester R.G. that she knew basic ASL and could communicate on a limited basis since she had a "functional ability." Tester R.G. was told that the facility had a board with words and pictures that residents could use to communicate. Defendant also told Tester R.G. there were some ASL fluent volunteers who periodically visit the facility, but that the facility would not provide a professional ASL interpreter.

## COUNT I: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT AGAINST ALL DEFENDANTS

78.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

79.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 has been in full force and effect and has applied to the Defendants' conduct.

80.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to the Defendants' conduct.

81.     At all times relevant to this action, Defendants received federal financial assistance,

including Medicare and/or Medicaid grants and/or reimbursements, and have been principally engaged in the business of providing health care. Therefore, Defendants' nursing homes are "a program or activity" receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

82.     Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

83.     Defendants' actions constitute discrimination, solely on the basis of disability, by denying meaningful access to the services, programs, and benefits the Defendants offer to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

84.     The Rehabilitation Act extends standing and relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2).  Plaintiff is an aggrieved person as defined by Section 794a(a)(2) of the Rehabilitation Act.

85.     On information and belief, the refusal to offer onsite ASL interpreter services is the result of a policy or practice of Defendants to prohibit or impede the use of onsite qualified sign language interpreters without regard to whether other methods will provide effective communication.

86.     Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, programs or activities receiving Federal financial assistance "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

87.     Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, healthcare providers "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question. . . . For the purpose of this paragraph, auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d).

88.     As set out above, absent injunctive relief there is a clear risk that Defendants' actions will continue to occur and continue to frustrate Plaintiff's mission.

89.     Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct and deliberate indifference, including the diversion of its resources and frustration of its mission, as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

90.     Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

## COUNT II: VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW AGAINST ALL DEFENDANTS EXCEPT DEFENDANT JOPAL SAYVILLE, LLC:

91.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim, except insofar as such paragraphs refer and/or pertain to Defendant JOPAL Sayville, LLC.

92.     At all times relevant to this action, the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code § 8-101 et. seq. has been in full force and effect and has applied to Defendants' conduct.

93.     At all times relevant to this action, Defendants' facilities have been places of public accommodation within the meaning of N.Y.C. Admin. Code §  8-102(9).

94.     At all times relevant to this action, Defendants' facilities have been housing accommodations within the meaning of N.Y.C. Admin. Code § 8-102(10).

95.     Pursuant to N.Y.C. Admin. Code § 8-107(4), it shall be unlawful discrimination for "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof."

96.     Additionally, pursuant to N.Y.C. Admin. Code § 8-107(15)(a), a place of public accommodation "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."

97.     N.Y.C. Admin. Code § 8-107(5)(a)(2) further provides that it shall be "an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignees, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of housing accommodation . . . to discriminate against any person because of such person's actual or perceived . . . disability."

98.     N.Y.C. Admin. Code § 8-107(5)(a)(3) further provides that it shall be unlawful "to declare, print or circulate or cause to be declared, printed or circulated any statement, advertisement or publication . . . which expresses, directly or indirectly, any limitation, specification or discrimination as to . . . disability . . . or any intent to make such limitation, specification or discrimination."

99.     Defendants discriminated on the basis of disability by withholding the accommodations, advantages, facilities or privileges of Defendants' services, in violation of N.Y.C.

Admin. Code § 8-107(4); by failing to accommodate in violation of N.Y.C. Admin. Code § 8-107(15)(a); by adopting policies that discriminate and deny full and equal participation in housing because of disability in violation of N.Y.C. Admin. Code § 8-107(5)(a); and by making statements expressing discrimination and limitations based on disability in violation of N.Y.C. Admin. Code § 8-107(5)(a)(3).

100.    The NYCHRL extends standing and relief to "any person claiming to be aggrieved by an unlawful discriminatory practice" in violation thereof. N.Y.C. Admin. Code § 8-502(a). Plaintiff is an aggrieved person as defined by Section 8-502(a) of the N.Y.C. Admin. Code.

101.    As set out above, absent injunctive relief there is a clear risk that Defendant's actions will continue to occur and continue to frustrate Plaintiff's mission.

102.    Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct, including diversion of resources and frustration of mission, as hereinbefore alleged pursuant to N.Y.C. Admin. Code § 8-502(a).

103.    Plaintiff is further entitled to an award of punitive damages pursuant to N.Y.C. Admin. Code § 8-502(a).

104.    Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

## COUNT III: VIOLATIONS OF THE FAIR HOUSING ACT AGAINST ALL DEFENDANTS

105.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

106.    This action is brought to enforce of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604, et. seq.

107.    Defendants own and lease dwellings within the meaning of U.S.C. § 3602(b), which

includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

108.   The FHA provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling," because of disability. 42 U.S.C. § 3604(f)(2).

109.   Under the FHA, discrimination includes "a refusal to make reasonable accommodations in rules, polices, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

110.   Under the FHA, it is unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

111.   Plaintiff's Testers requested and were denied the reasonable accommodation of having a qualified ASL interpreter for their elderly "family members," which would allow access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

112.   Defendants discriminated on the basis of disability, in violation of the above-cited provisions of the FHA.

113.   Defendants violated the FHA by, inter alia, denying Plaintiff's Testers' requests for the provision of a qualified sign-language interpreter and thereby denying their prospective "family members," on whose behalf the Testers were inquiring, access to services, programs or activities provided by Defendants in connection to their dwellings.

114.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission, as a result.

115.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to the FHA, 42 U.S.C. § 3613(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief:

a.     Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have discriminated in violation of FHA, Section 504 of the Rehabilitation Act, and/or the New York City Human Rights Law;

b.     Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

c.     Order Defendants:

i.     to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against deaf or hard of hearing individuals by failing to provide effective communication;

ii.     to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an onsite interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

      iii.    to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

      iv.    to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances;

      v.    to create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

      vi.    to train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the Rehabilitation Act, NYCHRL, and FHA;

      vii.    to train all their employees, staff, and other agents on a regular basis about Defendants' policy regarding how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals; and

      viii.    to implement a program of testing Defendants' employees, staff, and other agents to determine whether they are complying with the requirements of Section 504 of the Rehabilitation Act, the FHA, and the NYCHRL.

d.  Award to Plaintiff:

      i.    Compensatory damages pursuant to Section 504 of the Rehabilitation Act, the FHA, and the NYCHRL;

26

    ii.    Punitive damages pursuant to the FHA and the NYCHRL;

    iii.    Reasonable costs and attorneys' fees pursuant to Section 504 of the Rehabilitation Act, the FHA, and the NYCHRL;

    iv.    Interest on all amounts at the highest rates and from the earliest dates allowed by law;

    v.    Any and all other relief that this Court finds necessary and appropriate.

## JURY DEMAND

Plaintiff demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

Respectfully submitted,

EISENBERG & BAUM, LLP

By: _____

Eric M. Baum, Esq. (EB-5493)
ebaum@EandBlaw.com

Andrew Rozynski, Esq. (AR-2870)
arozynski@EandBlaw.com

Attorneys for Plaintiffs
Office and Post Office Address
24 Union Square East, Fourth Floor
New York, NY 10003
(212) 353-8700